**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**In re PNC FINANCIAL SERVICES GROUP,** )
**INC., SECURITIES LITIGATION** )          Civil Action No. 02-271
                                    )
                                    )          Electronic Filing

**OPINION**

Cercone, D.J.

     This action reflects the consolidation of several class action complaints filed in or
transferred to this district on or after February 1, 2002. On July 22, 2002, an order was entered
(1) consolidating the actions, (2) appointing specialist DPM, LLC, Teamsters Local 272 Labor &
Management Pension Fund, Joint Industry-Engineers Union Local No. 30 Pension Fund, and
Teamsters Local No. 210 Pension Fund as lead plaintiffs, (3) appointing the law firms of Milberg
Weiss, Schiffrin & Barroway, LLP, and Schoengold Sporn Blaitman & Lometti, P.C., as co-lead
counsel; and (4) appointing the law offices of Alfred Yates as liaison counsel for lead plaintiffs
and the putative class. On October 4, 2002, a consolidated and amended class action complaint
was filed seeking relief under the federal securities laws on behalf of all persons who purchased
PNC common stock, call options on PNC common stock, or sold put options on PNC stock, from
July 19, 2001, through July 18, 2002 ("the securities litigation"). Presently before the court are a
motion for final approval of partial settlement of class action and a motion for attorneys fees and
expenses in conjunction therewith. For the reasons set forth below, the motions will be granted.

     The first consolidated and amended class action complaint specifically alleged that PNC
Financial Services Group, Inc., and three of its former officers ("the PNC defendants"), with the
assistance of Ernst & Young ("E & Y"), engaged in a deceptive scheme to remove volatile,
troubled and non-conforming loans and venture capital investments from PNC's financial
statements in violation of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934
(the "Exchange Act") , 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder,

17 C.F.R. 3240.10b-5. The averments of the complaint asserted that over the course of three consecutive quarters defendants implemented and maintained a devise whereby the troubled and non-performing loans and investments were removed without disclosure to investors, banking regulators or the Security & Exchange Commission ("SEC") for the purpose of concealing the losses and thereby maintaining PNC's stock price. It was alleged that E & Y, working with AIG Financial Products Corporation, created an accounting structure for PNC to transfer the non-performing assets to special purpose entities in order to effectuate the concealment ("the SPE Transactions" or "PAGIC Transactions"). Through this vehicle defendants were alleged to have misrepresented: the amount PNC's non-performing assets in the second, third and fourth quarters of 2001; PNC's net income and earnings per share for the third and fourth quarters of 2001 and its net income and earnings per share for 2001; key financial ratios related to asset quality and loan levels for the second, third and fourth quarters of 2001; and PNC's compliance with generally accepted accounting principles ("GAAP") and/or the presentation of PNC's financial status. The first amended complaint was based on an extensive factual investigation by co-lead counsel after consultation with experts regarding the transactions at issue, the governing accounting, auditing and regulatory requirements, and PNC's public disclosures along with publicly available information relating thereto.

Federal banking regulators notified PNC that its treatment of the SPE Transactions did not comply with the applicable regulations. Thereafter, PNC announced on January 29, 2002, that it would reinstate its earnings for the second and third quarters of fiscal year 2001 and revise its fourth quarter and year-end 2001 earnings to reflect the consolidation of the three special purpose entities ("the restatement announcement"). The restatement announcement did not disclose the specific circumstances surrounding the creation and purpose of the PAGIC Transactions, PNC's essential ownership of the special purpose entities, the reasons for creating and utilizing them, and so forth. Allegedly it was not until July 18, 2002, some five months later, that all of the artificial inflation resulting from the alleged concealment was undone and the

2

market price for PNC's stock was no longer influenced by defendants' actions. On that date the SEC announced that as a result of "accounting improprieties" and in particular the "misuse of special purpose entities," it had issued a Cease and Desist Order against PNC.[1]  That same day federal regulators announced they had entered into an agreement with PNC to address matters needed to bring about compliance with GAAP and the consolidation of the PAGIC Transactions on PNC's regulatory reports and public financial statements. Allegedly, the market's reaction to these disclosures caused PNC's stock price to decline dramatically, dropping 15 percent on July 18, 2002, and an additional 6.55 percent on July 19, 2002.

The PNC defendants and E & Y each filed motions to dismiss the first amended complaint on December 6, 2002. Defendants contended, among other things, that the complaint failed to allege scienter with sufficient specificity under the applicable heightened pleadings standards and the public disclosures of January 29, 2002, were sufficient to cure any purported misrepresentations as a matter of law. Their accompanying briefs were lengthy and raised separate intricate and complex legal challenges to the theories of liability advanced. Plaintiffs' opposition to the motions was contained in a 72 page brief filed on January 10, 2003. Reply briefs were filed on February 11, 2003. Notwithstanding the posture of the litigation at that juncture, plaintiffs' counsel continued to investigate the underlying transactions and occurrences. During the course of this investigation co-lead counsel identified, analyzed and explored claims against other potential defendants. Additional information and disclosures became available in connection with the government's ongoing investigation into the PAGIC transactions.

On July 31, 2003, PNC's insurers filed an action under Declaratory Judgment Act seeking to establish that PNC's policies of insurance do not provide coverage for the type of conduct alleged in the first amended complaint. That action was assigned to this member of the court and

---

[1]An indictment against PNC followed. On June 2, 2003, PNC entered into a deferred prosecution agreement with the SEC wherein PNC agreed to pay $90 million into a fund for victim restitution and a $25 million dollar penalty in exchange for dismissal of the indictment after one year.

docketed as Federal Ins. Co. v. PNC Financial Services and PNC ICLC Corp., Civil Action No. 03-1114 ("the coverage action").

In November of 2003, co-lead counsel for the putative class, the PNC defendants and PNC's insurance carriers jointly sought and obtained leave to hold in abeyance the pending motions to dismiss in the securities action while they attempted to mediate the securities claims ("the mediation parties"). Mediation was conducted through the services of the Honorable Nicholas H. Politan, a retired federal judge specializing in mediating complex litigation. The mediation parties periodically reported on the progress of their efforts. During this time they engaged in numerous sessions with Judge Politan and attended several conferences with this court.

On December 17, 2004, the mediation parties entered into a memorandum of understanding ("MOU"). Therein, the PNC defendants (with the consent of certain of their carriers) and AIG Financial Products agreed with lead plaintiffs to settle the claims that had been or could have been asserted in the securities litigation which arise out of, relate to or are based on the allegations of the first amended complaint and relate to the acquisition or ownership of shares of PNC common stock during the period of July 19, 2001, through July 18, 2002. In consideration of the settled claims, PNC agreed to cause its insurers to deposit the sum of $30 million for the benefit of the class and AIG Financial Products agreed to pay the sum of $4 million to the class, all of which was placed in escrow as a qualified settlement fund.

The parties contemplated that ultimate distribution of the settlement fund would be combined and coordinated with administration of the restitution fund, thereby greatly reducing any administrative costs. PNC agreed to pay the reasonable costs and expenses for notice and administration of the settlement and restitution funds. PNC further agreed to assign to the putative class any and all claims it and its subsidiaries have against E & Y and any other non-settling persons or entities which arise from or relate to the subject matter of the securities litigation. Lead plaintiffs agreed to obtain PNC's consent to settle any assigned claims. They

4

also agreed to release the settling parties for all claims arising out of the acts and transactions underlying the securities litigation. PNC and AIG Financial Products also agreed to provide to lead plaintiffs all documents previously produced to the SEC and the United States Department of Justice in connection with the securities litigation. Based on these tenants the parties to the MOU executed an appropriate stipulation of settlement and thereafter sought preliminary and final approval for the same from this court.

The PNC defendants and AIG Financial Products produced in excess of 400,000 documents to plaintiffs' counsel. These documents included (a) transcripts of depositions taken by the SEC of officers and employees of PNC who had direct knowledge of the transactions and occurrences underlying the securities litigation; (b) a report of a special committee of PNC's board of directors and the corresponding exhibits thereto; (c) accounting opinion letters prepared by E & Y on PNC's behalf; (d) minutes and reports of PNC's board of directors' meetings; (e) drafts and final press releases; (f) documents relating to the PAGIC Transactions, including due diligence material; (g) legal opinion and true sale letters; (h) materials that were used to promote the PAGIC Transactions to PNC and other institutions; and (i) accounting memoranda relating to the PAGIC Transactions. Also included were e-mails between the settling defendants and E & Y and notes generated from interviews conducted by PNC's special committee of more than twenty-five employees of the settling defendants. The interviews included high-level personnel who had direct knowledge of various aspects of the PAGIC Transactions.

After reviewing the material produced pursuant to the MOU, plaintiffs' co-lead counsel entered into settlement negotiations with Arnold & Porter, LLP ("A & P") and Buchanan Ingersoll, PC ("BI"), the two law firms that provided legal services to PNC in connection with the PAGIC Transactions. After being made aware of plaintiffs' intent to commence federal securities claims and state law claims against them, and after intense negotiations regarding the same, A & P and BI agreed to contribute to the gross settlement fund in exchange for the settlement of all their potential liability arising out of the PAGIC Transactions. A & P agreed to

5

contribute $700,000 and BI agreed to contribute $1.9 million to the gross settlement fund. Thus, plaintiffs' co-lead counsel have secured $36,600,000 and the assignment of PNC's claims against E & Y for the benefit of the class.

On March 25, 2005, plaintiffs and the settling defendants entered into a stipulation and agreement of settlement. On March 31, 2005, this court entered an order certifying a class for settlement purposes, approving the settlement preliminarily, ordering notice of the settlement to be disseminated to the class, establishing July 15, 2005, as the filing deadline for any objection to the partial settlement and scheduling a final hearing on August 4, 2005. A consolidated and second amended class action complaint ("the second amended complaint") also was filed on March 31, 2005.

In March of 2004 co-lead counsel for plaintiffs began discussions with the trustee of the restitution fund in an effort to coordinate distribution of the $90 million restitution fund with the proceeds of any settlement of the securities litigation. Under the terms of the deferred prosecution agreement, PNC agreed that none of the proceeds of the restitution fund would be payable as attorneys' fees and all costs of administering the restitution fund would be borne by PNC ICLC Corporation. The trustee of the restitution fund, Louis Fryman, Esquire, and co-lead counsel reached an agreement-in-principle providing that the claims administrator would act under the trustee's supervision and as a trustee of the restitution fund while carrying out the claims administration in this action. In order to comply with the terms of the deferred prosecution agreement, it was agreed that, among other things, the claims administrator would mail notice to all record transferees and various brokerage houses and brokers that might have been acting as nominee owners of PNC stock; publish summary notice in widely circulated business newspapers or other publications; create a notice on the claim's administrator's website; process claims for the restitution fund and contact any claimants who submitted deficient claims and provide them with an opportunity to correct the deficiencies. PNC is to pay separately all costs of the restitution fund, as well as all of the notice and administrative costs for the class

6

action settlement, even if such increased expenses would not have been paid under the terms of the deferred prosecution agreement. Subsequently, the trustee acquiesced in the plan of allocation and the proposed procedures for coordinated distribution.

On November 30, 2004, AIG, on behalf of AIG, AIG Financial Products and AIG Financial Products PAGIC Equity Holdings, Inc., agreed to pay $46 million in restitution and a $80 million fine in exchange for resolution of allegations asserted against it in a complaint filed by the SEC. The allegations arise out of the PAGIC Transactions at issue in the securities litigation. The United States Department of Justice subsequently directed that $20 million of the $80 million fine also be paid to the restitution fund. Thus, the restitution fund now contains more than $156,000,000. Co-lead counsel and the trustee for the restitution fund having agreed that the entire fund will be distributed jointly with the proceeds from the settlement of this action. Consequently, more than $192,000,000 million in cash is to be distributed in accordance with the plan of allocation, with the costs of notice and settlement administration costs being borne by PNC.

The plan of allocation was formulated with the direct input and participation of plaintiffs' damage expert, Scott Hakala, a chartered financial analyst holding a doctorate of philosophy degree in economics from the University of Minnesota. Doctor Hakala is the Director at CBIZ Valuation Group, LLC, a national business valuation and consulting firm that provides expert advise concerning damage and loss causation issues for the purposes of evaluating potential liability in securities litigation. After analyzing (1) market models designed to shed light on the relationship between PNC's stock price returns and (a) the returns of common stock in general and (b) common shares of similar companies, (2) all press releases, (3) SEC filings, (4) PNC annual reports to shareholders for July 2000 through July 2003, (5) stock price and financial information on PNC Financial Services Group, Inc., available on various electronic and news service databases and (6) the allegations in the first amended complaint, Doctor Hakala concluded there were two primary corrective disclosure events during the class period: one on

7

January 29, 2002, and a second on July 18, 2002. After considering the historical events during the class period and the "look back" period of ninety days thereafter, the market reaction to the two primary corrective disclosure events and other pertinent information, Doctor Hakala determined that the price of PNC stock was artificially inflated by 20.2 percent prior to the corrective disclosure on January 29, 2002, and 14.9 percent between that time and the corrective disclosure on July 18, 2002. It was further determined with the input of counsel that damages for the purchase of shares after January 29, 2002, should be appropriately discounted for legal reasons. After factoring a further reduction for these transactions, the plan of allocation provides $111 million for purchases made prior to January 29, 2002 (58 percent of the proceeds from the combined gross settlement and restitution funds), and the balance for purchases made after January 29, 2002 (42 percent of the proceeds from the combined funds). Plaintiffs estimate that had the matter proceeded to trial they would have been able to prove class members incurred approximately $1,150,000,000 in aggregate damages consisting of approximately $525 million for transactions occurring between July 19, 2001, and January 29, 2002, and $625 million from January 30, 2002 through July 17, 2002. After factoring in a 40 percent discount to reflect the inherent risk and additional difficulties in establishing claims based on purchases after January 29, 2002, the plan of allocation discounts the $625 million to approximately $375 million – resulting in an allocation of 42 percent of all recognizable total damages as being incurred during the second portion of the class period.

Pursuant to the preliminary approval order, the claims administrator forwarded 73,339 notices to class members. A summary notice also was published in the Wall Street Journal on April 28, 2005. The notice alerted class members that they could exclude themselves from the settlement and still be eligible to receive payment under the restitution fund. In that event their total recovery would be less than if they participated in both the class action and restitution funds. Class members also were given the option to file objections to the proposed partial class action settlement and requested attorneys fees and costs submitted in conjunction therewith. No

8

class member objected to the class action settlement, the concomitant plan of allocation or the request of plaintiffs' counsel for fees and expenses.

The certified class for settlement purposes now moves for final approval of the partial settlement, contending that when weighed against the attendant risks and potential rewards of continued litigation, the partial settlement represents an excellent result for the class. This proposition is uncontested by the members of the class. Consequently, plaintiffs maintain that the partial settlement should be approved as fair, reasonable and in the best interest of the class.

Federal Rules of Civil Procedure 23(e) mandates that "[a] class action shall not be dismissed or compromised without the approval of the court." Fed. R. Civ. P. 23(e); In re GMC Pick-Up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768, 796 (3d Cir. 1995). This rule "imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims." In re Prudential Ins. Co. American Sales Litigation, 143 F.3d 283, 316 (3d Cir. 1998) (quoting G.M. Trucks, 55 F.3d at 805).

In order to fulfill this duty the court is required to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims would be extinguished." In re Cendant Corp. Litig., 264 F.3d 201, 231 (3d Cir. 2001), cert. denied sub nom., Mark v. California Public Employees' Retirement Sys., 535 U.S. 929 (2002). While the court is to employ a vigorous analysis in fulfilling its fiduciary duty to protect the rights of absent class members, it must also "guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." In re Prudential, 148 F.3d at 317 (quoting G.M. Trucks, 55 F.3d at 806).

Seeking class certification and settlement approval simultaneously heightens the court's obligation to undertake a scrupulous review to determine whether the proposed settlement is fair, reasonable and adequate for the class. In re Prudential, 143 F.3d at 317. "This heightened

9

standard is intended to ensure that class counsel has engaged in sustained advocacy throughout the course of the proceedings, particularly in settlement negotiations, and has protected the interests of all class members." In re Warfarian Sodium Antitrust Litig., 391 F.3d 516, 534 (3d Cir. 2004).

There is an overriding public interest in settling class action litigation, and it is to be encouraged by the courts, particularly in complex settings that will consume substantial judicial resources and have the potential to linger for years. In re Warfarin, 391 F.3d 535 (collecting cases in support). And a presumption of fairness attaches to a proposed settlement where (1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objects. Id. (citing In re Cendant, 264 F.3d at 232 n. 18).

"The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." In re Prudential, 148 F.3d at 317 (quoting Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975)). The exercise of this discretion is guided by what have become known as the Girsh factors. In re Warfarin, 391 F.3d at 535. These are:

      (1)    The complexity, expense and likely duration of the litigation;

      (2)    The reaction of the class to the proposed settlement;

      (3)    The stage of the proceedings and the amount of discovery completed;

      (4)    The risks of establishing liability;

      (5)    The risks of establishing damages;

      (6)    The risks of maintaining the class action through trial;

      (7)    The ability of the defendants to withstand a greater judgement;

      (8)    The range of reasonableness of the settlement fund in light of the best possible recovery; and,

      (9)    The range of reasonableness of the settlement fund to the best possible recovery in light of all the attendant risks of litigation.

Girsh, 521 F.2d at 157. The proponents of a settlement bear the burden of proving consideration of these factors on balance warrants approval of the proposed settlement. In re Cendant, 264 F.3d at 232; In re Rent-Way Sec. Litig., 305 F. Supp.2d 491, 499 (W.D. Pa. 2003).

The record demonstrates that circumstances equivalent to those that give rise to a presumption of fairness are present. In addition, application of the pertinent Girsh factors establishes that the proposed settlement is fair, reasonable and adequate for the class and should be approved.

As an initial matter, we note that the settlement was negotiated at arm's length over several months with the assistance of retired United States District Judge Nicholas Politan. As plaintiffs note, this fact in itself significantly dispels any concern of collusion.

Second, while the parties have not engaged in formal discovery due to the stay imposed by the Private Securities Litigation Reform Act ("PSLRA"), co-lead counsel have diligently investigated and analyzed the events and issues pertaining to the transactions and occurrences giving rise to plaintiffs' claims in the securities litigation. Over the course of the past three years co-lead counsel have thoroughly analyzed the strengths and weaknesses of the claims of the class under applicable law in various settings. The analysis has included preparing formal opposition to defendants' motion to dismiss, memoranda and briefs in preparation for mediation and settlement negotiations and the preparation of the consolidated and second amended class action complaint. More specifically, co-lead counsel have analyzed PNC's class period and pre-class period financial statements, collected and reviewed a comprehensive compilation of analyst reports and major financial news service reports on PNC, consulted with various accounting experts, consulted with various damage experts, reviewed the pertinent public filings, including those relating to the cease and desist order issued by the SEC, and analyzed the agreement reached between federal regulators and PNC regarding the PAGIC Transactions. They have also reviewed over four hundred thousand pages of documents that were produced pursuant to the MOU, which documents include the transcripts of depositions taken by the SEC of officers and

11

employees of PNC; a report of the special committee of PNC's board of directors and the corresponding exhibits attached thereto; minutes and reports of PNC's board of directors meetings; the pertinent press releases; materials underlying the due diligence undertaken with regard to the PAGIC Transactions; the materials created to promote the PAGIC Transactions; and interviews by PNC's special committee of numerous employees of the settling defendants. Thus, while the record does not reflect development from formal discovery, it does contain an adequate basis to demonstrate that an informed and competent investigation and evaluation of the claims against the settling defendants has been undertaken.

Third, co-lead counsel are highly experienced and skilled practitioners who have successfully prosecuted numerous class actions throughout the United States. Lead counsel for the settling defendants have an equally well-respected reputation on a national level.

Finally, no class member has objected to the proposed settlement. In addition, only five elections to opt out were made after notice was forwarded to over 73,000 class members and published in a prominent newspaper enjoying national circulation.

It follows that the proposed settlement enjoys an initial presumption of fairness. Furthermore, an analysis of the Girsh factors confirms the accuracy of this presumption and provides an independent basis for finding the proposed settlement reflects a fair, reasonable and adequate compromise of the claims against the settling defendants.

The complexity, expense and likely duration of the litigation

The record sufficiently demonstrates that without approval of the proposed partial settlement, the litigation that would ensue would (1) be expensive, (2) time consuming, (3) involve complex issues of law and fact in establishing liability and proving damages, and (4) consume substantial judicial resources. First, notwithstanding the significant review of various documents, reports, hearings, public documents and announcements and interviews that have been undertaken by co-lead counsel to date, it is clear that formal fact and expert discovery would be exceedingly time consuming and expensive. One need only review the memorandum

12

submitted by the parties in conjunction with defendants' motions to dismiss to gain an immediate appreciation for the complexity of issues raised and the hard-fought battles that would ensue from plaintiffs' pursuit of establishing liability and proving damages. Defendants' contentions concerning the curative effect of the January 29, 2002, disclosures, the challenge to plaintiffs' ability to prove sufficient scienter, and the calculation of damages during the discreet periods comprising the class period present just a few of the readily apparent issues that would give rise to "a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court" if the litigation were to proceed. In re Prudential, 148 F.3d at 318. In addition to the resolution of the claims against PNC and its senior officers, the proposed settlement resolves claims plaintiffs would have brought against AIG Financial Products, A & P, and BI. The addition of multiple parties and the influx of multiple claims involving different elements, burdens and forms of proof, and evidentiary challenges would only add to the intricacy and difficulty of what can already be properly characterized as complex litigation.

In addition to the complexity, time and expense that would be present in pursuing formal discovery, plaintiffs likely would be confronted with extensive motions practice. Defendants likely would file motions for summary judgment raising complex issues that would take months to brief and argue. Resolution of those motions would consume substantial judicial resources and time. Assuming success in defeating defendants' summary judgment motions, plaintiffs would likely be confronted with a barrage of evidentiary motions, including challenges to the testimony of plaintiffs' expert witnesses (which have become fairly standard through the prevailing practices of the defense bar). Beyond these pretrial impediments, plaintiffs would face the formidable task of preparing and presenting their case at trial and defending the likely appeals that would follow from any substantial verdict. From the court's perspective, it is clear that pursuing the claims and potential claims against the settling defendants would add complexity, expense and delay which could postpone actual recovery for years. Compare In re Safety Components International, Inc., Sec. Litig., 166 F.Supp.2d 72, 85 (D. N.J. 2001) ("even if the

Plaintiff Class were to recover a larger judgment at trial, which is not guaranteed, the additional delay caused by trial, post-trial motions and the appellate process, would delay recovery for years").

Pursuing the litigation against the settling defendants likewise would give rise to complex issues surrounding the calculation of damages. Plaintiffs would likely need multiple experts to establish attribution for each party's conduct.

Additional aspects of the record also have a bearing on the complexity and duration of the litigation that plaintiffs would face in obtaining an actual recovery. As previously noted, a declaratory action has been filed by the lead underwriter of PNC's directors and officers insurance policy. Difficulties in the negotiations between PNC and its carriers threatened to derail the mediation process before Judge Politan on a number of occasions. The proposed partial settlement reflects $30 million contributed by PNC's carriers. Without the proposed partial settlement, additional litigation over the scope and availability PNC's insurance would almost certainly occur. Similarly, the proposed partial settlement alleviated a potential derivative shareholder suit. Thus, the proposed settlement eliminates what would be complex, expensive and contentious litigation at multiple levels.

### Reaction of class members to the proposed settlement.

Although not dispositive, the response of class members to a proposed Rule 23(b) (3) class action settlement is relevant to a court's fairness determination. In re Prudential, 148 F.3d at 318. Although the practical realities of a class action dictate a cautious approach to recognizing an inference of support from the lack of a significant number of objectors to a sophisticated settlement, the receipt of only a small number of objections provides support for the approval of a proposed settlement. Id. at 318; In re Smithkline Beecham Corp. Sec. Litig., 751 F. Supp. 525, 530 (E.D. Pa. 1990) (the lack of any objection by class members is a pertinent factor in evaluating the fairness, reasonableness and adequacy of a proposed settlement).

Here, no class member objected to the proposed settlement. Similarly, only five opt outs

14

were received after the mailing of over 73,000 copies of the notice and the publication of the summary notice. Under these circumstances an inference of strong class support is properly drawn. In re Rite Aid Corp. Sec. Litig., 269 F. Supp.2d 603, 608 (E.D. Pa. 2003) ("given the very large stock losses class members have suffered, to say nothing of the sheer number of class members, the lack of any objection can only be regarded as astonishing."); In re Safety Components, 166 F. Supp.2d at 85 ("the vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of settlement.").

<u>The stage of the proceedings and the amount of discovery completed.</u>

This factor permits the court to take into account the degree of case development that has occurred prior to reaching a compromise. In re Cendant, 264 F.3d at 235. Its purpose is to assure that the parties had "adequate appreciation of the merits of the case before negotiating." G.M. Trucks, 55 F.3d at 813; In re Prudential, 148 F.3d at 319. Engaging in formal discovery is not essential, however, or even the critical focal point of the analysis. In re Rite Aid, 269 F. Supp.2d at 608; In re Safety Components, 166 F. Supp.2d at 88; Krangel v. Golden Rule Res., Inc., 194 F.R.D. 501, 507 (E.D. Pa. 2002). Instead, the pertinent assessment concerns the degree to which counsel have been able to gain access to sufficient information to permit an informed, competent and supported evaluation of the legal and factual issues involved.

Here, although not engaging in formal discovery, co-lead counsel have gained a thorough understanding of the legal and factual issues encompassed within the potential claims being compromised and an adequate appreciation of their merits. As previously noted, co-lead counsel have continued to investigate the claims against the PNC defendants for over three years. They have gained access to over 400,000 documents, including key reports, deposition testimony and investigation interviews. Through these disclosures they have gained access to information conveyed by individuals who had first hand knowledge of the transactions and occurrences in question. Furthermore, submitting the proposed settlement was contingent on counsels' review

15

of the information produced pursuant to the MOU, thus providing a safety net to guard against being deprived of critical information. Given the vast array of information made available to co-lead counsel, it is clear that they had a thorough understanding of the legal and factual issues underlying the claims being compromised and gained an adequate appreciation of the merits of the case before negotiating and finalizing the proposed settlement. Under these circumstances the stage of the proceedings and the lack of formal discovery do not stand as impediments to the approval of the settlement. See In re Rite Aid, 269 F. Supp.2d at 608 (approving proposed settlement where "the parties did not engage in much formal discovery" but did engage in "an immense amount of informal discovery"); Krangel; 194 F.R.D. at 507 (recognizing that the lack of significant discovery does not stand as an impediment to early settlement where the record reflects sufficient development of the critical issues raised by the litigation); Mashburn v. National Health Care, Inc., 648 F. Supp. 660, 669 (M.D. Ala. 1988) (noting preference favoring early compromise where record reflects counsels' access to sufficient information to gain informed and competent understanding of the merits) (collecting cases in support).

### The risks of establishing liability and damages.

These factors provide the means to balance the likelihood of success and the potential damage award if the case were to proceed to trial against the benefits of an immediate settlement. In re Prudential, 148 F.3d at 319. Through this lense the court can review "what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." In re Cendant, 264 F.3d at 237.

Plaintiffs face significant risks in establishing liability against each of the settling defendants. As noted above, plaintiff's claims are based on Sections 10b-5(a), (b) and (c) of the Exchange Act. In order establish their claim under Section 10b-5(b), they must be able to prove among other things that each defendant (1) was responsible for an omission or misstatement; (2) that constituted a false statement or material omission; (3) made with scienter; that (4) caused the class to suffer damages. Ernst & Ernst v. Hockfelder, 425 U.S. 185, 193 n. 12 (1976). To

16

succeed under the claims that were brought pursuant to Sections 10b-5(a) and (c), plaintiffs must establish that each defendant (1) committed a manipulative or deceptive act; (2) in furtherance of a scheme and artifice to defraud, (3) with scienter; that (4) caused the class to suffer damages. In re GlobalCrossing, Ltd., Sec. Litig., 322 F. Supp.2d 319 (S.D. N.Y. 2004). Claims under these sections were filed against the PNC defendants and plaintiffs were prepared to bring certain, if not all, of these claims against the other settling defendants.

The attendant risks in proving each of the claims and potential claims cannot be summarily discounted. Establishing materiality in any securities claim involves a complex undertaking of fact and law. The PNC defendants have argued that plaintiffs will be unable to prove liability because the facts and circumstances surrounding the PAGIC Transactions fail to evidence improper motive or state of mind. The individual defendants contend they never profited or attempted to profit from any alleged wrongful act. No individual defendant attempted to sell stock during the class period. Similarly, it is readily apparent that at least some of the settling defendants would mount a defense based upon the Supreme Court's abolishment of "aider and abettor" liability in Central Bank M.A. v. First Interstate Bank, N.A., 511 U.S. 164 (1994). And beyond these basic challenges all defendants have contended that the alleged GAAP violations are insufficient to sustain a finding of scienter, particularly where the accounting issues are complex and outside accountants purportedly gave independent approval to the challenged statements. Finally, the PNC defendants contend that the timing of two of the three PAGIC Transactions undermines any inference of an intent to deceive investors.

Moreover, plaintiffs also face tangible risks in establishing damages. The elements of causation and damages present particularly difficult and complex matters for resolution at trial. Such matters often involve conflicting expert opinion and the reaction of a jury to the same. Of course, the possibility that a jury may reject complex expert testimony on causation and damages always is a realistic possibility.

In addition, defendants already have asserted that the public announcements on January

17

29, 2002, sufficiently cured any purported misrepresentation, and, even assuming the court were to rule that the curative effects of the January 29, 2002, disclosures reflect a matter to be resolved by the trier of fact, a jury could accept defendants' contention and reduce plaintiffs' damages to a fraction of the amount claimed. Similarly, all settling defendants other than the PNC defendants can argue that any of their alleged acts or omissions did not cause the economic loss for which plaintiffs seek redress. Again, the risk of a jury being persuaded by such arguments is inherent in proceeding to trial.

In short each area of contention presents an appreciable degree of risk in plaintiffs' ability to establish a recovery. In contrast, the proposed partial settlement removes any uncertainty and provides the class with the immediate tangible benefit of a substantial settlement.

#### The risks of maintaining the class action through trial.

Under Rule 23 a district court may decertify or modify a class at any time during the litigation if it proves to be unmanageable. Thus, there will always be a "risk" or potential for decertification and in the "settlement-only" context an examination of this factor has been rendered "perfunctory." In re Prudential, 148 F.3d at 321. Nevertheless, the defendants' position advanced in the motions to dismiss strongly suggest that the class certification will be a contested process, particularly with regard to the class period. In addition, the settling defendants may well have advanced arguments based on Durah Pharm., Inc. v. Broudo, 125 S. Ct. 1627 (2005), to confine the class. And arguments in relation to the definition of the class and plaintiffs' ability to prove "loss causation" have the potential to resurface even after initial class certification. Thus, there is a cognizable risk in maintaining the action in accordance with the certification advanced for settlement purposes.

#### The ability of the defendants to withstand a greater judgment.

This factor focuses on whether the defendants "could withstand a judgment or an amount significantly greater than the settlement." In re Cendant, 264 F.3d at 240. The record contains no information that any settling defendant would be unable to withstand a significantly greater

18

judgment. Thus, in a general sense this factor weighs against settlement. See In re Cendant, 264 F.3d at 241.

<div align="center">The range of reasonableness of the settlement fund in light<br>of the best possible recovery and all the attendant risks of litigation.</div>

These factors attempt to assess "whether the proposed settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." In re Rent-Way, 305 F. Supp.2d at 508 (quoting In re Prudential, 148 F.3d at 322). In general, it is proper to consider the present value of the damages plaintiffs likely would obtain if successful at trial, appropriately discounted for the risk of not prevailing, and contrast that amount with the recovery provided through the proposed settlement. Id. (quoting In re Safety Components, 166 F. Supp.2d at 92. Of course, this evaluation must be undertaken with the recognition "that settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and [as a result the court must] guard against demanding too large a settlement based on the court's view of the merits of the litigation." In re Safety Components, 166 F. Supp.2d at 92.

Co-lead counsel estimate that if all potential claims were to be sustained and plaintiffs were to enjoy complete acceptance of their theories by the finder of fact, the class would establish approximately $1.5 billion in aggregate damages. In contrast, the proposed partial settlement provides an immediate recovery of $36.6 million in cash, plus interest, as well as the assignment of PNC's claims against E & Y. While the total present value of the settlement cannot be definitively ascertained at this juncture, it is clear that it is within the range of reasonableness even though it reflects only a fraction of the total recoverable damages. Several aspects of the record support this.

First, as noted above, pursuing the action to judgment would give rise to numerous attendant risks. Among them would be the finder of fact's prerogative to determine that the restatement announcement released on January 29, 2002, was a sufficient "corrective" disclosure. In that event the ninety day look-back period mandated by the PSLRA would

<div align="center">19</div>

significantly affect plaintiff's ability to prove damages because the price of PNC stock temporarily rose during that ninety day period. Plaintiffs' total aggregate damages would be less than $100 million.

Moreover, the proposed settlement has components of value that cannot be liquidated at this time. These include the ability of the entire class to recover under the $156.366 million restitution fund, the assigned claims and the recovery of administrative costs. When combined, the partial settlement and restitution fund will provide the class with more than $193 million in compensation. In addition, the class will acquire the benefit of pursuing the additional assigned claims with a pledge of cooperation from PNC in doing so. Finally, the proposed settlement spares the class hundreds of thousands of dollars in notice and administrative costs because payment of these expenses will be borne by PNC.

When considered on balance, the components of the proposed settlement constitute a very reasonable range of settlement when compared to the best possible recovery discounted by the attendant risks of proceeding to trial.

It follows that consideration of the pertinent factors under Girsh weighs in favor of approving the proposed settlement. Pursuing the litigation would likely be protracted, expensive and complex. The PNC defendants have and would no doubt continue to defend the action vigorously. Numerous hurdles remain in the path of obtaining an optimal recovery. The proposed settlement presents the class with a substantial monetary recovery, opportunities to minimize expenses and an ability to obtain an additional recovery. The response of the class to the proposed settlement is indeed remarkable and clearly raises the inference of overwhelming support, particularly with regard to the numerous institutional investors that will be entitled to reap its monetary rewards. Co-lead counsel have worked diligently in investigating the strengths and weaknesses of the claims and potential claims being compromised and it is clear that the negotiations were entered with a proficient appreciation for the relative merit of the claims and defenses raised and likely to be raised. There are concrete attendant risks that would be

20

associated with pursuing the litigation against the settling defendants and non-defendants which strongly support an amicable resolution. When considered on balance, the proposed partial settlement is well within the range of reasonableness when contrasted with the best possible recovery and the risks attendant with proceeding to trial. Accordingly, the proponents of the proposed partial settlement have carried their burden of demonstrating that it reflects a fair, reasonable and adequate resolution of the class claims being compromised.

<p style="text-align: center;">Ernst & Young's objections to the partial settlement.</p>

The non-settling defendant, E & Y, contends that the proposed "bar orders" contained in the partial settlement improperly exceed the scope of this court's authority, are improperly unilateral and will extinguish E & Y's right to bring a variety of independent, known claims (or to assert the same in defense) in other tribunals without adequate compensation. Specifically, E & Y contends the mutual bar order on contribution claims mandated by the PSLRA reflects the only bar order that can be entered in connection with the settlement of private securities claims and the settling parties' proposed bar orders are not mutual and reach well beyond those claims that properly can be extinguished under the PSRLA. As a result, E & Y purportedly will be precluded from asserting legitimate contribution and other state law claims against PNC and the other settling defendants in other actions, such as those that could be asserted in actions brought by the "opt-out" class members or that E & Y might assert against AIG Financial Products in connection with PNC's malpractice and misrepresentation claims assigned to the class pursuant to the MOU. Because the proposed settlement assertedly fails to provide adequate compensation to E & Y for the potential loss of its independent tort and contract claims against the released parties, and contribution claims against the non-party settling defendants, E & Y maintains that the entry of the proposed bar orders will exceed this court's legitimate authority and single it out for unduly prejudicial and unfair treatment.

E & Y also maintains that the proposed plan of allocation is unfair. It asserts the proposed plan has not been established as fair and reasonable because the formulas and

<p style="text-align: center;">21</p>

percentages reflected in the stock price inflation over the duration of the class period have not been sufficiently explained and tested through the adversarial process. Contending that its memorandum of law in support of its motion to dismiss will demonstrate that the claims for payment based on purchases after the January 29, 2002, restatement announcement are meritless, E & Y asserts that the plan of allocation will unfairly diminish its likely potential judgment reduction for the only purchasers who may be able to establish a claim for recovery against E & Y. According to E & Y, this perceived disparity renders the plan unfair and unreasonable and provides a further basis for denying the motion for final approval of the partial settlement.

Plaintiffs maintain the bar orders are consistent with the PSLRA and are authorized by the controlling federal common law. They further assert that any perceived overbreadth of the "complete bar order" is sufficiently undermined by close consideration of the terms of the entire order of partial settlement when construed in the context of the claims being settled and applicable law. As to any articulated claims that conceivably cannot be extinguished in the instant setting, plaintiffs maintain that a "savings clause" precludes future unfair interpretations of the complete bar order and will serve to provide any "reciprocity" required by law. By (1) assuring that mutual reciprocity will be recognized whenever necessary and (2) providing E & Y with a judgment reduction mechanism that goes well beyond that required by the PSLRA, plaintiffs maintain that E & Y is receiving "fair" compensation for all contribution and indemnity claims which clearly will be extinguished by the complete bar order and it will not be precluded from pursuing any truly independent claims even if they are somehow "related" to the settled claims.

Plaintiffs also maintain that E & Y's objections to the plan of allocation do not preclude the entry of the final partial settlement order. They contend E & Y lacks standing to challenge the plan  because its rights are adequately protected by the settlement's judgment reduction provision and the record contains more than sufficient information to demonstrate that the plan is fair and reasonable in any event.

22

PNC joins in the arguments advanced by plaintiffs. In addition, it maintains that the assignment of its claims to plaintiffs pursuant to the MOU and the entry of the complete bar order will create complete reciprocity between PNC and E & Y: neither will be able to bring claims against the other. It also will permit complete reciprocity between plaintiffs and E & Y: plaintiffs are not barred from pursuing the assigned claims because they are not a "released party" and stand in the shoes of PNC as of December 17, 2004; and E & Y will be free to assert all claims it can advance in defense and set offs that it would have been able to assert against PNC had PNC retained and litigated the assigned claims. Beyond this reciprocal relationship, PNC maintains the complete bar order is necessary because E & Y is being sued by plaintiffs for its own misconduct, a limitation inherent in the securities claims it faces, and federal statutory and common law make clear that any claims for contribution or indemnification premised on such liability are properly barred, however they may be denominated or styled. The partial settlement also properly releases all contributing entities, PNC's insurers, and various affiliates, employees and others associated with the settling entities in exchange for a corresponding judgment reduction provision. And any argument that the definition of "released parties" may inure to others who are not entitled to the benefit of the bar orders is eliminated by the operation of the judgment reduction provision in conjunction with a settlement provision that will become operative in the event plaintiffs sue an individual or entity other than E & Y for claims related to the subject matter of the securities litigation. Finally, PNC maintains that any complaint about hypothetical entities or potential claims that may be brought by opt-outs or other future claimants fails to present a concrete legal controversy ripe for resolution and can be resolved in the future by the appropriate court through the savings clause as construed in conjunction with the application of the bar orders and the subject matter of the claims being compromised.

As a general matter, non-settling defendants lack standing to object to a partial settlement agreement because they ordinarily are not affected by such agreements. Eichenholtz, 52 F.3d at 482 (collecting cases); Zupnick v. Fogel, 989 F.2d 93, 98 (2d Cir. 1993). There is, however, a

23

recognized exception to this general rule which permits a non-settling defendant to "object to a partial settlement which purports to strip it of a legal claim or cause of action, an action for indemnity or contribution for example, or to invalidate its contract rights." Eichenholtz, 52 F.3d at 482 (citations omitted). E & Y's objections to the propriety and scope of the bar orders fall squarely within this exception and thus it has standing to object to these aspects of the proposed partial settlement.[2]

The proposed order for final partial settlement bars and enjoins plaintiffs from pursuing any and all claims whatsoever, "whether based on federal, state, local, statutory or common law or any other law, rule or regulation," whether known or unknown, that have been asserted in this securities litigation by plaintiffs, or could have been asserted in any forum by plaintiffs

> against any of the Released Parties which arise out of,
> relate to, or are based upon the allegations, transactions, facts,
> matters or occurrences, representations or omissions involved,
> set forth, or referred to in the Consolidated Class Action Complaint
> filed by Lead Plaintiffs in the Securities Litigation and relate to
> the acquisition or ownership of shares of, or call or put options on,
> the common stock of PNC during the Class Period, or the claims
> against any of the released parties arising from or related to the
> subject matter of securities litigation asserted by [PNC Common
> Stock Shareholder] Andrew J. Goslin in his demand letter dated

---

[2] In contrast, E & Y's objections to the plan of allocation present precisely the type of challenge which a non-settling defendant lacks standing to pursue. In order to have standing to challenge a partial settlement "a non-settling defendant may not merely claim an interest in the lawsuit but must show some cognizable prejudice to a legal relationship between it and the settling parties." In re School Asbestos Litig., 921 F.2d 1330, 1332 (3d Cir. 1990) (citing In re Fine Paper Litig., 632 F.2d 1081, 1087 (3d Cir 1980). E & Y's arguments concerning the proposed plan of allocation are essentially based on the contention that its potential liability to the plaintiffs could be adversely affected because it will ultimately prevail on its efforts to limit the class period, which in turn will cause the proposed plan to adversely affect the ultimate reduction in judgement to which it may be entitled. The conjectural nature of this argument and the inability to test its premises are readily apparent. But even beyond these shortcomings and as discussed in more detail below, the settlement's judgement reduction provision contains the alternative offsets of a proportional reduction or pro tanto formula, thereby assuring E & Y will be fairly protected from the very evils it perceives in the plan. Furthermore, the class members', the settling defendants' and the trustee of the restitution fund's expressed support for the entry of the partial settlement and its concomitant plan of allocation provide sufficient independent corroboration of the reasonableness and fairness of the plan beyond this court's current review.

24

> June 10, 2003 and any other derivative demands that might be
> filed in connection with the PAGIC transactions (the "Settled
> Claims") against (a) the Settling Defendants; (b) PNC and PNC's
> predecessors, successors, parents, subsidiaries, affiliates, and their
> respective present and former directors, officers and employees ... ;
> (c) the Insurers; (d) AIG Financial Products Corp. and AIG
> Financial Corp.'s predecessors, successors, parents, subsidiaries,
> affiliates and their respective present and former directors,
> officers and employees; (e) Arnold & Porter, Arnold & Porter LLP,
> and their current and former partners and employees; and (f) Buchanan
> Ingersol, PC, Buchanan Ingersol LLP, and their current and former
> employees, shareholders, and partners and their attorneys in this
> matter ("Released parties").

Proposed Final Partial Settlement Order at ¶ 7. Additions to the term "settled claims" include

those claims assigned under the MOU to plaintiffs that PNC has against Arnold & Porter, LLP,

and Buchanan Ingersoll, PC, that arise from or are related to the subject matter of the securities

litigation. Id. The term does not include claims against E & Y and its predecessors, successors,

assigns and affiliates. Id. The term "released parties" likewise does not include E & Y and its

predecessors, successors, assigns and affiliates. Id. The settled claims are compromised,

discharged and dismissed against the released parties on the merits with prejudice upon entry of

the order. Id.

The proposed order contains three separate bar orders: one in accordance with the

mandate of the PSLRA, 15 U.S.C. § 78u-4(f) (7) (A), and the applicable case law thereunder; one

pursuant to Pennsylvania's Joint Tortfeasor Statutes, 42 Pa. C. S. § 8327; and a "complete bar

order." The provision barring contribution claims in accordance with the PSLRA provides in

pertinent part:

> The Released Parties are by virtue of the Settlement hereby
> released and discharged from all claims for contribution that have
> been or may hereafter be brought by any person or entity, whether
> arising under state, federal or common law, based upon, arising out
> of, relating to, or in connection with the Settled Claims. Accordingly,
> to the full extent provided by the PSLRA, the Court hereby bars all
> claims for contribution: (a) against the Released Parties; and (b) by
> the Released Parties against any person or entity other than any
> person or entity whose liability to the Class has been extinguished
> pursuant to the Stipulation and this Order and Final Judgment (the
> "Reform Act Bar Order").

25

Proposed Final Partial Settlement Order at ¶ 12.

In accordance with Pennsylvania law, the released parties are released and discharged

from any liability to the plaintiffs. The proposed order provides:

> The Released Parties are by virtue of the Settlement hereby
> released and discharged from any liability to Lead Plaintiffs, the Class,
> or any Class Member under Pennsylvania's Joint Tort Feasor Statutes,
> 42 Pa. § 8327, and applicable case law. Accordingly, to the full extent
> provided by Pennsylvania's joint tortfeasor statutes, the Court hereby bars
> all claims for contribution under 42 Pa. § 8327: (a) against the Release Parties;
> and (b) by the Released Parties against any person or entity other than
> any person or entity whose liability to the Class has been extinguished
> pursuant to the Stipulation and this Order and Final Judgment. (The
> "Pennsylvania Bar Order").

Proposed Final Partial Judgment Order at ¶ 13.

The third bar order provides:

> The Released Parties are by virtue of the Settlement hereby
> released and discharged to the fullest extent allowed by law from
> and against any and all claims, however styled, whether for
> indemnification, contribution, or otherwise arising out of or
> relating to the acts and transactions that are the subject of the
> Securities Litigation, whether arising under federal, state,
> or common law (the "Complete Bar Order").

Proposed Final Partial Settlement Order at ¶ 14.

In accordance with the PSLRA, any final verdict or judgment obtained by or on behalf of

any class member against any person other than a released party relating to the settled claims is to

be

> ... reduced by the greater of (a) an amount that corresponds
> to the percentage of responsibility of the Released Party for the loss
> to the Class Member or (b) the amount paid by or on behalf of the
> Released Party to the Class Member in connection with the
> Settlement.

Proposed Final Partial Settlement Order at ¶ 15. In addition, the proposed order contains the

following provision for a reduction in judgment based on any non-barred claim perfected by any

non-settling defendant against any released party:

> To the extent (but only to the extent) not otherwise covered
> by the Reform Act Bar Order or the Complete Bar Order, Lead
> Plaintiffs, the Class, and all Class Members shall reduce or credit

26

> against any judgment or settlement (up to the amount of such judgment or settlement) they may obtain from any Non-Settling Defendant an amount equal to the amount of any final, non-appealable judgment which any Non-Settling Defendant may obtain against any of the Released Parties arising out of or relating to the Settled Claims of Lead Plaintiffs, the Class, or any Class Member.

Proposed Final Partial Settlement Order at ¶ 16. In the event of settlement against a non-settling defendant, plaintiffs are required to obtain a release of any claim that the non-settling defendant may have against any of the released parties arising out of or related to the settled claims, subject to the execution of a reciprocal release by the released party in favor of the non-settling defendant. Id.

### Applicable General Principles

Prior to the enactment of the PSRLA, it was well recognized that "public policy strongly favors the pretrial settlement of class action lawsuits." In re U.S. Oil and Gas Litigation, 967 F.2d 489, 493 (11th Cir. 1992); Eichenholtz v. Brennan, 52 F.3d 478, 486 (3d Cir. 1995) ("In general, the settlement of complex litigation before trial is favored by the federal courts."). This policy emanated from the staggering realization that complex litigation can often "occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive." U.S. Oil and Gas, 967 F.2d at 493. Where the litigation involved multiple defendants, the right to contribution often inhibited partial settlement. Eichenholtz, 52 F.3d at 486. This is because "defendants, who are willing to settle, 'buy little peace through settlement unless they are assured that they will be protected against co-defendants' efforts to shift their losses through cross-claims for indemnity, contribution, and other causes related to the underlying litigation.'" Id. (quoting U.S. Oil and Gas, 967 F.2d at 494). As a result, "modern settlements increasingly [have] incorporate[d] settlement bar orders into partial settlements." Eichenholtz, 52 F.3d at 486.

Many states have enacted settlement bar statutes which authorize a court to bar the right of contribution provided the partial settlement is made in good faith and any non-settling

defendant is given a credit or set-off against any ultimate judgment. Id. Prior to the passage of the PSLRA, the federal securities statutes do not contain such a mechanism, however, and as a result a number of federal courts sought to harmonize the equitable principles of contribution with the policy of encouraging settlement by imposing a contribution bar order "as a matter of federal common law, finding that a fair and equitable settlement bars implied rights of contribution for federal securities claims." Id. In Eichenholtz, the United States Court of Appeals for the Third Circuit joined "with those federal courts that have opted for a nationwide federal settlement bar rule." Id. at 486 n. 14 (citations omitted).

As a means of harmonizing the equitable principles of contribution with the policy of promoting settlement, the courts developed various methods for offsetting the elimination of a non-settling defendant's right of contribution. These included the "proportionate judgment reduction method" wherein the finder of fact was requested to determine the relative culpability of both the settling and non-settling defendants and assign a commensurate percentage of the total injury to each. Id. at 487. The non-settling defendant is required to pay only its commensurate share of the damages, placing the risk of a "bad" settlement squarely on the plaintiffs, who retain an incentive to assure each defendant pays its fair share of damages. Id. The proportionate fault rule was recognized as "the equivalent of a contribution claim because it limited the non-settling defendant's responsibility to its proportionate share of liability." Id. at 487; TBG, Inc. v. Bendis, 36 F.3d 916, 923 (10th Cir. 1994) (same) (cited with approval in Eichenholtz). Other common approaches included the pro tanto and pro rata methods. Id. at 487 n. 15 (citing In re Jiffy Lube Sec. Litig., 927 F.2d 155, 161-62 n. 3 (4th Cir. 1991)).

The 1933 and 1934 Acts do not contain an express right of indemnification. And the federal courts have been uniform in holding that there is no implied right to indemnification under the federal securities laws. Eichenholtz, 52 F.3d at 483 (collecting cases). The courts have recognized that "indemnification runs counter to the policies underlying the 1933 and 1934 Acts," which were designed to encourage diligence and discourage negligence in securities

28

transactions. Id. at 483-484. Consequently, as a general matter federal courts have disallowed claims for indemnification. Id. at 484 (citing U.S. Oil and Gas, 967 F.2d at 495 among other cases). Thus, contractual claims to indemnification have been precluded even when the defendant claimed it was "merely negligent, played a 'de minimis' role in the public [disclosure] at issue, or was being held derivatively or vicariously liable." Eichenholtz, 52 F.3d at 484. Enforcing a claim for contractual indemnification, even where the defendant's liability is premised on negligence under the securities laws, would run counter to the prophylactic purpose of ensuring accurate investigating and reporting by all accountable parties responsible for public reports, particularly those who assume roles of verification and supervision. Id. at 485.

These principles governing contribution and indemnification claims in the context of Securities Act claims were well established when Congress passed the PSLRA. Provisions of the PSLRA mandate that any partial securities class action settlement contain a contribution bar order. Section 78u-4(f) (7) (A) of the PSLRA provides:

> In general, a covered person who settles any private action at any time before final verdict or judgment shall be discharged from all claims for contribution brought by other persons. Upon entry of settlement by the court, the court shall enter a bar order constituting the final discharge of all obligations to the plaintiffs of the settling covered person arising out of the action. The order shall bar all future claims for contribution arising out of the action (i) by any person against the settling covered person and (ii) by the settling covered person against any person, other than a person whose liability has been extinguished by the settlement of the settling covered person.

15 U.S.C. § 78u-4(f) (7) (A). A covered person includes a defendant in a securities fraud action.

The PSLRA also mandates a corresponding reduction in the final judgment obtained against any non-settling defendant. Section 78u-4(f) (7) (B) of the PSLRA provides:

> Reduction-if a covered person enters into a settlement with the plaintiff prior to final verdict or judgment, the verdict or judgment shall be reduced by the greater of (i) an amount that corresponds to the percentage of responsibility of that covered person; or (ii) the amount paid to the plaintiff by that covered person.

15 U.S.C. § 78u-4(f) (7) (B). Thus, a non-settling defendant whose claim to contribution is

29

barred by an order approving partial settlement receives the greater of the proportionate fault rule or the pro tanto approach, thus assuring that the class bears all risk in brokering a partial settlement and retains the incentive to ascertain and prove each defendant's fair share of damages.

It is against this backdrop that we consider E & Y's objections to the bar orders.

## The PSLRA Mandates

E & Y's general contention that the provisions of the PSLRA cabin this court's authority to bar a non-settling defendant's claims when entering a partial settlement order does not give us much pause for concern. The overwhelming weight of authority addressing the issue of whether the PSLRA was intended to provide the exclusive approach to a court barring claims upon the entry of a partial settlement has soundly rejected the proposition. See In re Rite Aid, 146 F. Supp.2d at 726-27 (declining to construe the PSLRA as restrictive legislation prohibiting a court from entering a bar order covering claims other than those for contribution or as an attempt to exhaustively detail every action a court is permitted to undertake in approving a partial settlement in a securities action); In re Sterling Foster & Co., Sec. Litig., 238 F. Supp.2d 480, 485-86 (E.D. N.Y. 2002) (recognizing that rights to indemnification, contribution and other offsets may be extinguished through a bar order that contains a judgment reduction provision consistent with the PSLRA); Lucas v. Hackett Assoc., Inc., 18 F. Supp.2d 531, 535-36 (E.D. Pa. 1998) (recognizing that compliance with the PSLRA's contribution provisions does not preclude broader bar orders that cover indemnity and de facto/implied indemnity claims based on federal securities law liability); Wisconsin Investment Board v. Ruttenberg, 300 F. Supp.2d 1210, 1216 (N.D. Ala. 2004) ("the court concludes that Section 78u-4(f) (7) (A) of the PSLRA does not divest the court of the power to fashion bar orders extinguishing claims other than those for contribution ....").

That the PSLRA was not intended to provide the exclusive form of permissible bar orders flows from a review of the statutory language and its legislative history when undertaken with an understanding of the then existing case law addressing bar orders. No aspect or provision of the

30

PSLRA addresses or suggests that it is the only bar order that may be sanctioned by the courts. See In re Rite Aid, 146 F.Supp.2d at 726 ("Moreover, the PSLRA provision, discussed above, that directs us to enter a bar order precluding contribution claims does not include any explicit language stating that the order therein described is the *only* bar order that we may entertain.") (emphasis in original); Wisconsin Investment Board, 300 F. Supp.2d at 1216 ("the language of 15 U.S.C. § 78u4(f) (7) (A) does not address the propriety of a bar order precluding non-contribution claims."). The legislative history likewise does not provide further insight into the congressional intent in including a contribution bar, and, more importantly, it fails to indicate that the explicit requirement of a contribution bar was intended to displace the established discretionary authority to enter a more comprehensive bar order. See In re Cedant, 166 F. Supp.2d at 6 (legislative history of PSLRA fails to indicate whether the contribution bar was intended to include or displace a court's authority to preclude related claims); Wisconsin Investment Board, 300 F. Supp.2d at 1216-17 ("the statute's legislative history fails to indicate Congress' rationale for including a contribution bar, nor does it affirmatively state that the contribution bar contained in § 78u-4(f) (7) (A) divests a court of its discretionary authority to enter a bar order broader in scope than the statutory model."). Thus, neither the text of the PSLRA nor the its legislative history support E &Y's contention that the statute is to be construed as a ceiling on this court's authority to enter a more comprehensive bar order in appropriate circumstances.

Moreover, guidance on the proper inference to be drawn from the PSLRA's lack of any limiting or restricting language in its contribution bar provision properly is drawn from the legal landscape that existed at the time the legislation was enacted. It is well-settled that Congress is presumed to have been aware of and understood the status of the law in the area under consideration. Lorillard v. Pons, 434 U.S. 575, 581 (1978) ("Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least in so far as it affects a new statute."); National Labor Relations Board v. Gullett Ginco, 340 U.S. 361,

31

366 (Congress presumed to have enacted legislation with knowledge of established judicial or administrative action in the area under consideration); National Lead Co. v. United States, 252 U.S. 140, 147 (1920) (Congress is presumed to have legislated with knowledge of established practice within an executive department of the government). The seminal case law generally recognized three categories of claims frequently being raised in conjunction with the entry of bar orders: (1) the implied right to seek contribution under both the 1933 and 1934 Acts as recognized by the Supreme Court in Central Bank, N.A. v. First Interstate Bank, N.A., 114 S. Ct. 1439, 1448-49 (1994); (2) indemnification claims being advanced notwithstanding the courts' general recognition that there is no implied right to indemnification under the securities laws; and (3) state law causes of action for contractual indemnity and related claims. U.S. Oil and Gas, 967 F.2d 494; In re Jiffy Lube, 927 F.2d at 160; Eichenholtz, 52 F.3d at 484-87. Each of these categories of claims commonly was raised by non-settling defendants in an effort to shift their losses. The general jurisprudence recognized that bar orders could extinguish claims for contribution and indemnity and established equitable safeguards to protect a non-settling defendant's rights from undue prejudice. This backdrop cannot be overlooked in evaluating E & Y's arguments concerning the legal implications from the PSLRA's mandate of a contribution bar order.

While the PSLRA did establish a settled "offset" formula to be utilized in conjunction with orders precluding contribution claims by non-settling defendants, its text and legislative history reveal no intent to mandate or limit anything beyond the offset formula to be utilized when a bar against contribution claims is entered. In re Cendant, 166 F. Supp.2d at 6-7. Given the other types of claims frequently considered in conjunction with the entry of bar orders and the lack of any specific provisions addressing such claims, a presumption is raised that Congress intended to leave intact the courts' discretion to consider the propriety of barring other claims where appropriate. Cf. Lindahl v. Office of Personnel Management, 470 U.S. 768, 782 (1985) (Congress will not be presumed to have displaced established judicial doctrine in an area to be

32

regulated absent an explicit repeal or repudiation of that established doctrine). Thus, the conclusion that the PSLRA was not intended to preclude the entry of a bar order addressing indemnity or state-related claims is adequately supported by the judicial precedent existing at the time the PSLRA was enacted and the congressional silence on the application of this precedent beyond contribution claims.

### The proper scope of the comprehensive bar order.

The parties, and in particular PNC and E & Y, strenuously dispute the scope of claims that properly may be barred in a partial settlement of class action securities litigation and the manner by which any such claims are determined to be within or independent of the categories of claims properly extinguished by a bar order. E & Y strenuously contends that the Comprehensive Bar Order will strip it of "independent" claims that it may be able to advance against the released parties and will single it out for unfair and prejudicial treatment. Of course, these claims have not been formally presented to this or any other court, essentially due to the fact that the instant litigation has not formally progressed beyond the filing of motions to dismiss.

Plaintiffs and PNC contend the entry of a bar order precluding future contribution and indemnity claims in any form clearly is within this court's discretion and is warranted under the circumstances. They further assert that any argument by E & Y that the Complete Bar Order is overly broad raises hypothetical issues that are not ripe for consideration and any such concerns are sufficiently alleviated by the "savings clause" in the Complete Bar Order in any event. In other words, to the extent this court is unable to determine which if any of E & Y's unarticulated claims are within the scope of the Complete Bar Order, then the savings clause will permit full and fair consideration of such matters after concrete and material controversies arise and are presented to a tribunal for consideration.

While it is clear that the outer boundaries of the proposed bar orders cannot be comprehensively drawn at this juncture, the pre-PSLRA jurisprudence by the Courts of Appeals does provide significant guidance on this aspect of the parties' dispute. U.S. Oil and Gas was

33

one of the first cases to establish specific guidelines for the entry of bar orders. There, one
defendant entered into a settlement agreement with the class but objected to the entry of a
comprehensive bar order that would extinguish its ability to pursue pending cross-claims for
fraud and negligence against another co-defendant that subsequently entered into a separate
partial settlement agreement with the class. The bar order in question provided:

> All claims, however denominated, regardless of the allegations,
> fact, law, theories, or principles on which they are based, including but
> not limited to claims for contribution or indemnity against the settling
> defendants ..., which claims now exist or have accrued or in the future may
> exist or accrue, and which arise out of or are in any way related to the
> class action or the receiver's action or the subject matter of those
> actions, or arise out of or are in any way related to the Companies, are
> extinguished, discharged, satisfied, and/or otherwise unenforceable.

U.S. Oil and Gas, 927 F.2d at 493 n. 2. After noting the public policy strongly favoring partial
settlement of class actions, the modern trend of incorporating settlement bar orders "such as the
one at issue in [the] case," and a challenge to the objecting defendant's standing, the court
addressed the merits of the defendant's argument "that independent claims and indemnity claims
cannot be precluded through a settlement bar order." Id. at 495. After considering the
defendant's proffered authority, the court observed there was little principled distinction between
bar orders covering contribution claims and those eliminating indemnity and other "so-called
'indemnity claims.'" Id.

In rejecting the objecting defendant's argument that prior federal cases supporting bar
orders dealt exclusively with contribution claims, the U.S. Oil and Gas court observed that
several federal courts had approved settlement bar orders extinguishing indemnity claims. Id.
(citing among other cases In re Jiffy Lube, 927 F.2d at 158; and Franklin, 884 F.2d at 1225 &
1225 n.2). After observing that there is no federal implied cause of action for indemnification
under the 1933 and 1934 Acts, the court perceived the defendant's cross-claim as "largely an
attempt to seek indemnification" from the settling defendant and opined that as a result "it was
unlikely to survive even the most cursory adjudication on the merits." Id. at 495. As to the
objecting defendant's "independent causes of action for fraud and negligence," the court

34

concluded that they merely sought damages measured by the extent to which the objecting

defendant was held liable to the plaintiff class. Drawing a similarity with the old colloquialism

that "a rose by any other name is still a rose," the court opined that such claims were "nothing

more than claims for contribution or indemnification with a slight change in wording." Id. at

496. Because these asserted independent claims "were integrally related to the plaintiffs' claims

against both [defendants]," they properly had been extinguished through the bar order. Id.

In an effort to establish the proper focus in assessing the scope of settlement bar orders,

the U.S. Oil and Gas court opined:

> The propriety of the settlement bar order should turn
> on the interrelatedness of the claim that it precludes, not the
> labels which the parties attach to those claims. If the cross-
> claims that the district court seeks to extinguish through the
> entry of a bar order arise out of the same facts as those
> underlying the litigation, then the district court may exercise
> its discretion to bar such claims in reaching a fair and equitable
> settlement. That is precisely what the district court did in this
> case.

Id. In contrast, the case did not present "one of those rare instances where a cross-claim

unrelated to the defendants' liability to the plaintiffs has somehow remained in the case,"

although the court questioned whether "truly independent claims that a settlement bar order

cannot extinguish will ever remain in a class action lawsuit." Id. at 496 n. 5. It declined to

decide "that hypothetical question" on the facts before it, finding that the cross-claims under

consideration "were sufficiently related to the subject matter of the plaintiffs' case against

defendants" and thus properly had been barred. Id. at 496 n. 5.

The court in Eichenholtz similarly assessed the propriety of a bar order entered as part of

a partial settlement of class action securities litigation. There, the district court approved a

partial class action settlement agreement that contained the following bar order:

> Each of the Non-Settling Defendants, each of the
> Settling Defendants, and any other Person who may assert a claim
> against the Settling Defendants based upon, relating to, or arising
> out of the Settled Claims, the Action or the settlement of this Action,
> are permanently barred, enjoined and restrained permanently from
> commencing, prosecuting, or asserting any such claim or claims

35

> for contribution or indemnity or otherwise denominated, against
> the Settling Defendants, as claims, cross-claims, counter-claims,
> or third-party claims in the Action or in any other court, arbitration,
> administrative agency or forum, or in any other manner, including
> but not limited to offset. All such claims are hereby extinguished,
> discharged, satisfied and unenforceable.

Eichenholtz, 52 F.3d at 482-83 n. 8. The non-settling defendants appealed and argued their rights to indemnification and contribution, and one defendant's state law contractual right to indemnification, improperly had been extinguished.

The court evaluated the non-settling defendants' different claims for indemnification separately. After observing the substantial body of authority rejecting any implied right to indemnification under the federal securities laws, the court concluded there was no implied right to seek indemnification under the federal securities laws. Eichenholtz, 52 F.3d at 483-84. It then turned to consider the one defendant's claim of "contractual right to indemnification." Id. at 484. After noting that federal courts generally have disallowed claims for indemnification because they run counter to the policies which the federal Securities Acts seek to promote, the court reasoned that enforcing any contractual right to indemnification in the context of a securities lawsuit would defeat the prophylactic purposes underlying the duties the securities laws imposed on the non-settling defendants and "would contravene the congressional intent to protect the public, particularly unsophisticated investors, from fraudulent practices." Id. at 485. Consequently, the non-settling defendant did not have a right to indemnification and the district court did not abuse its discretion in extinguishing "any causes of action for indemnification." Id. at 485.[3]

The post-PSLRA jurisprudence by the district courts within the Third Circuit also provides guidance on evaluating a challenge to the scope of a bar order. In Lucas v. Hackett Assoc., Inc., 18 F. Supp.2d 531 (E.D. Pa. 1998), Judge DuBois considered the propriety of

---

[3] The court also concluded that the bar order did not improperly extinguish the non-settling defendant's recognized right to contribution because the settlement agreement instituted a proportionate judgment reduction that was equivalent to any extinguished claim for contribution. Id. at 487.

36

entering a bar order that extinguished claims against a settling defendant "based upon, relating to, or arising out of the settled claim, this action, [and] a lawsuit pending in the Court of Common Pleas for Montgomery County, Pennsylvania ... for contribution or indemnification or otherwise... as claims, cross-claims, counterclaims, or third-party claims in the action, the state action, or in any other court ..." Lucas, 18 F. Supp.2d at 534. After concluding that the PSLRA provisions on contribution did not preclude the entry of a broader bar order, Judge DuBois held that to the extent a non-settling defendant intended to "seek indemnification premised on violations of federal securities laws-whether those violations are clothed as state law, tort claims or federal law security claims-[it] may not seek indemnity because such claims are preempted ...." Id. at 535. This included claims of indemnification based on the state law claims that had been filed by the plaintiffs, provided the state law claims sought damages for what essentially was a violation of the federal securities laws. Id. at 536. In contrast, to the extent the plaintiffs' state law claims were independent of all federal securities law claims, then the non-settling defendant's right to seek indemnity under state law was not foreclosed. After observing that a mere overlap in damages does not necessarily transform independent state law claims into claims for implied indemnity, Judge DuBois concluded that the issue of whether the non-settling defendant's indemnity claims in the state law litigation were or were not "de facto" federal securities claims was a matter for the state court to resolve. Id. at 536 & 536 n. 1. Accordingly, he concluded that any bar order governing indemnity claims had to be limited to "de facto" federal securities claims and the determination of whether the non-settling defendant's claims in the state litigation fell within that category was a matter that rested with the state court. Id. at 537-38.

In In re Rite Aid, Judge Delzell considered the propriety of a comprehensive bar order in conjunction with a proposed partial settlement of class action shareholder litigation and the complete settlement of federal and state derivative litigation. In re Rite Aid, 146 F. Supp.2d at 711. There, like here, the settling parties proposed a "Reform Act bar order extinguishing all

37

claims for contribution among both the non-settling and settling defendants and barring the non-settling defendants from commencing the same in the future, a bar order under state law prohibiting the non-settling defendant from prosecuting or asserting 'any other claim, however styled, whether for indemnification, contribution or otherwise,' against the Released Parties based upon, arising out of or relating to the Settled Claims," and a judgment reduction provision modeled on the PSLRA. Id. at 720-21. Two non-settling former corporate officers of Rite Aid strenuously objected to the proposed bar orders. They posited that while state law claims seeking contribution may properly be barred, the proposed bar order "would cover many actions, including certain indemnity actions as well as claims for defamation and claims made under employment agreements, that do not sound in contribution and therefore may not now be barred." Id. at 722. They further contended that the orders would impermissibly strip them of rights to indemnification provided by Delaware corporate law and Rite Aid's by-laws as well as contractual rights contained in one officer's severance agreement. Id. at 723.

Judge Delzell began his analysis with a resitation of "[t]he proscription against federal courts giving advisory opinions," which he noted was "as old as our Constitution" Id. (citing State of N.J. v. Heldor Industries, 989 F.2d 702, 706 (3d Cir. 1993)). He reasoned that these principles did not preclude the court from addressing the parties' disputes over the propriety and nature of the proposed bar orders, but did preclude any "sort of claims- or right-specific analysis" of the claims that the non-settling defendants contended would be wrongly precluded by the proposed bar orders. He explained:

> Thus, we may not consider individually each of the
> Non-Settling Defendants' purported claims and assess whether
> each of these particular asserted claims is or should be affected
> by the language of the purposed Bar Order. Rather, in order to
> avoid rendering an advisory opinion, we must instead begin our
> analysis at the end of the problem, and examine the language of
> the proposed Bar Order and inquire as to its provenance and propriety,
> without regard to its effect on specific hypothesized claims that the
> Non-Settling Defendants may someday assert. Naturally, this sort
> of analysis must also involve, to an extent, an examination of the
> effect of the proposed order on certain types of classes of claims,
> but it does not require (nor as discussed above, may we in any

38

event engage in) an analysis of the effect of this order on particular specific claims allegedly held by the Non-Settling Defendants.

Id. at 725. After considering the propriety of barring various implicated classes of claims under the applicable and persuasive precedent, Judge Delzell concluded that the proposed complete bar order was sufficiently similar to those approved in Eichenholtz and Neuberger v. Shapiro, 110 F. Supp.2d. 373, 381 (E.D. Pa. 2000), and overruled the non-settling defendants objections. Id. at 729.

It is on the above landscape that the parties present and we consider the various arguments in support of and against the specific bar orders in question. E & Y and PNC strenuously dispute the scope of claims that properly can be barred. As previously noted, E & Y contends that the entry of the bar orders will preclude it from asserting independent non-contribution claims and legitimate contribution and other state law claims against PNC in other actions that may be commenced, such as in actions brought by the opt-outs  or against the non-party settling defendants in connection with PNC's malpractice and misrepresentation claims that have been assigned to plaintiffs. Because E & Y may have a whole host of claims based upon independent duties running directly from the settling defendants and released parties that arise as a matter of state tort and contract law, such claims purportedly will be improperly extinguished by operation of the bar orders notwithstanding any potential "overlap" in damages with the claims asserted by plaintiffs.

PNC maintains that E & Y's purported "independent" claims are in the end merely interrelated claims that arise out of the facts underlying the instant litigation and therefore all such claims properly are barred because they are nothing more than indemnity claims for securities law liability in disguise. From PNC's perspective, E & Y seeks to shift any losses and damages that it will incur in connection with the claims asserted by plaintiffs to PNC or another settling defendant, and therefore all such claims lack true independence. PNC notes that E & Y is being sued by plaintiffs under the securities laws for its own misconduct and if it is held liable to the class for having violated those laws, any effort to shift its own responsibility and

39

concomitant losses to others is contrary to federal law and the public policy informing its development.

Plaintiffs maintain that the proposed bar orders are consistent with the Third Circuit's decision in Eichenholtz and E & Y has yet to assert any of its so-called independent claims. From their perspective E & Y's objections are premised on speculative claims and concretely addressing them at this juncture would result in an advisory opinion. Because E & Y's arguments are premised on unripe and hypothetical claims, any analysis of the propriety of the proposed partial settlement must necessarily be limited to generalized formulations. In other words, the determination of whether E & Y's unasserted claims are in fact "sufficiently independent" to escape the bar orders is a matter to be determined in future proceedings before this or any other appropriate forum. At that juncture the text of the proposed bar orders and the context in which they are being entered will provide the appropriate guideposts to resolve any question of whether a truly "independent" claim has been presented. And when such matters are properly raised, the "savings clause" will permit this or any other appropriate tribunal to determine the outer contours of the bar orders with regard to specific claims raised in a concrete setting. As a consequence plaintiffs maintain that E & Y's objections to the bar orders are unavailing.

We agree with PNC that Eichenholtz and U.S. Oil and Gas, and the precedent cited in those decisions, establish clearly that indemnification claims integrally related to the securities claims being compromised properly may be extinguished through a comprehensive bar order, regardless of whether such claims are based on federal securities law or state tort or contract law - provided that they seek damages measured by or arising out of the non-settling defendant's liability to the class plaintiffs. The Eichenholtz court considered not only whether an implied right to indemnification arises under the 1933 and 1934 Acts, but also whether a specific contractual right to indemnification could be enforced in such a setting. After concluding that the specific underwriter indemnification agreements under consideration ran counter to the

40

policies underlying the Securities Acts, claims that necessarily were predicated on contractual state law rights, the court held that "the district court did not abuse its discretion in barring and extinguishing any causes of action for indemnification." Eichenholtz, 52 F.3d at 485 (emphasis added). Thus, any cause of action for indemnification, however styled or pled, properly may and will be barred by the Complete Bar Order. Numerous pre- and post PSLRA decisions also support this assessment. See Baker, Watts & Co. v. Miles & Stockbridge, 876 F.2d 1101, 1108 (4th Cir. 1989) ("it would run counter to the basic policy of the federal securities laws to allow a securities wrongdoer ... to shift its entire responsibility for federal violations on the basis of a collateral state action for indemnification."); U.S. Oil and Gas, 967 F.2d at 495 ("because [the non-settling defendant's] cross claim was largely an attempt to seek indemnity from [a settling defendant] for the federal securities law violations alleged in the complaints, it was unlikely to survive even the most cursory adjudication on the merits."); Lucas, 18 F. Supp.2d at 535 ("the Court holds that to the extent that [the non-settling defendant] intends to seek indemnification premised on violations of federal securities laws-whether those violations are clothed as state law tort claims or federal law securities claims-[it] may not seek indemnity because such claims are pre-empted ..."); In re Rite Aid, 146 F. Supp.2d at 727-29 (approving complete bar order that clearly extinguished state-law indemnification claims based upon, arising out of, relating to, or in connection with "the Settled Claims or the subject matter thereof").

And state law claims by a non-settling defendant seeking damages for what in essence are injuries arising from its own violations of the federal securities laws likewise properly are extinguished no matter how they are styled or denominated. See Baker, Watts, 876 F.2d at 1108 (the federal securities law pre-empt state claims to the extent they allow a right of action for indemnification based on liability arising from violation of the 1933 or 1934 Acts); Eichenholtz, 52 F.3d at 485 (contractual indemnification agreements pertaining to underlying transactions giving rise to securities law liability run counter to the federal policy underlying the securities laws and therefore are properly barred); U.S. Oil and Gas, 967 F.2d at 496 ("[the non-settling

41

defendant's])fraud and negligence claims 'are nothing more than claims for contribution or indemnification with a slight change in wording' [and] properly [were] extinguished ... in the settlement bar order."); Wisconsin Investment Board, 300 F. Supp.2d at 1219 (approving bar order after remand that extinguished a non-settling defendant's contribution and "independent" claims against a settling defendant to the extent those claims arose out of the transactions and occurrences forming the investors' securities fraud class action); Lucas, 18 F. Supp.2d at 535-36 (indemnification premised on liability arising from a violation of the federal securities laws "whether clothed as state law, tort claims or federal security claims" is preempted and properly barred.).[4]

We also agree with plaintiffs that attempting to pontificate about the outer reaches of the Complete Bar Order beyond the general assessments set forth above is beyond our constitutional authority because to do so would jettison us into a sea of hypothetical and/or unripe claims. And we recognize that this well established constitutional boundary on our authority precludes a definitive resolution of the dispute between PNC and E & Y concerning the proper construction of E & Y's purported independent claims. But as Judge Dalzell observed in In re Rite Aid:

> While we may know the outlines of these asserted rights and claims from the non-settling defendants' description of them in their briefing, this level of knowledge is not sufficient for us to even determine whether they would in fact be barred by the language of the proposed bar order, much less whether they are the sort of claims that are legally permitted to go forward in the wake of the partial settlement of a securities action.

---

[4]Judge DuBois' refusal to bar certain of the non-settling defendant's state law indemnity claims in Lucas does not provide significant support for E & Y's position. Judge DuBois did bar all state law indemnity claims seeking to recover "damages for what are essentially violations of the federal securities laws" but declined to bar the non-settling defendant's potential indemnity claims "under state law." Lucas, 18 F. Supp.2d at 536. The latter were, however, limited to liability the plaintiffs were seeking to impose against the non-settling defendant pursuant to state law claims that were "sufficiently independent of the federal securities claims" being settled in the federal securities litigation. Id. Thus, Judge DuBois necessarily recognized that it was the nature of and basis for the liability being imposed upon the non-settling defendant that dictated whether a concomitant claim for indemnity would survive the operation of the bar order, not (as E & Y intimates) whether the rights and duties can be said to have some origin in state law. Id.

In re Rite Aid, 146 F. Supp.2d at 725. Consequently, we are limited to an analysis of the effect of the proposed bar order on the general types of claims referenced by the parties. Id.

We agree with E & Y that its "independent claims," to the extent they are truly independent, cannot be extinguished by this court. No court has expressly held that truly independent claims may be extinguished by a bar order in order to achieve settlement in complex securities litigation. In fact, the courts have repeatedly observed that truly independent claims are beyond the scope of a settlement bar order and/or they have convinced the parties to designate such claims as being beyond the reach of the bar order in question. See e.g. U.S. Oil and Gas, 967 F.2d at 496 n. 5 (recognizing that truly independent claims can in rare instances remain in a class action lawsuit); Lucas, 18 F. Supp.2d at 536 (recognizing that state law claims sufficiently independent of the federal securities claims might give rise to indemnification claims that would be beyond the proper scope of a bar order even if the damages were to overlap); In re Rite Aid, 146 F. Supp.2d at 725 n. 27 (identifying the contract and corporate state law claims that the parties explicitly agreed to exclude from the operation of the bar order at the court's urging); Gerber v. MTC Electronic Technologies Co., Ltd., 329 F.3d 297, 306 (2d Cir. 2003) (recognizing that independent defamation and breach of contractual/fiduciary duty claims can be beyond the proper scope of a settlement bar order).

That said, however, we cannot agree with E & Y's proposition that whether a cause of action is sufficiently independent to escape operation of the bar orders is dependent upon the source of the duties of the parties and whether the theory of recovery is separately recognized under state law. Such an approach would subvert the principles governing claims for indemnification under the federal Securities Acts and invite mischief that would run counter to the policies underlying federal securities law. Instead, we believe the proper approach is a claim-by-claim analysis that includes consideration of the source of the liability and injury that triggers the asserted right to recovery, the rights and duties upon which the cause of action is predicated, the specific injuries alleged and the cause of action's measure of damages.

43

We recognize that the above approach does not provide the parties with definitive guidance on the breadth of the Complete Bar Order. But at this juncture all that can be said with certainty is that where a claim is predicated on rights or duties that flow from or are related to the transactions and occurrences underlying the PAGIC Transactions and the damages arise or stem from the liability running to the class members, there can be little doubt that the claim(s) are nothing more than alternative attempts to resurrect avenues to recover contribution or indemnity, notwithstanding their denomination or label. Such claims clearly are understood to be "interrelated" and within the scope of the Complete Bar Order. And while we are in agreement with (1) the observation in U.S. Gas and Oil that it is difficult to conger up a truly independent cross claim that will remain after the resolution of the main claims in a securities action such as this and (2) the arguments of PNC that it is difficult to believe E & Y will ultimately be able to identify an independent claim that can be asserted in another tribunal that would be related to the subject matter of this case but yet not properly within the scope of the bar orders, a claim not falling within the specific confines set forth above or arising out of some different form of liability against E & Y will require a concrete assessment of its specific contours by the tribunal called upon to resolve the controversy. Beyond these basic observations the lack of concrete claims before this court and the constitutional restrictions on the exercise of its jurisdiction preclude further venture into the "menagerie" referenced by E & Y. Meaningful and binding assessments can be made only after a claim is advanced in a competent tribunal and the bar orders are invoked as a defense. Both Judge Dubois and Judge Dalzell recognized as much in refusing to rule definitively on the preclusive effect of the bar orders before them on claims yet to be raised or that were dependent on the nature and success of state law claims pending before another tribunal. And we must do the same.

The lack of our ability to render further guidance on specific applications of the bar orders does not, however, stand as an impediment to approval of the partial settlement agreement because E & Y's remaining objections are based on a misapprehension of the components of the

44

Settlement Agreement or are otherwise misplaced. Several aspects of the record support this determination.

First, we agree with PNC that as between plaintiffs, PNC and E & Y, there is mutual reciprocity. Upon entry of the order of partial settlement PNC will be unable to pursue any claims against E & Y arising out of the PAGIC Transactions because it will be deemed to have effectively assigned all such claims to the lead plaintiffs pursuant to the MOU. E & Y will be barred from pursuing claims against the PNC defendants that arise out of or relate to the securities litigation and are within the scope of the Reform Act Bar Order or the Complete Bar Order. Each will thus lack the ability to proceed against the other.

Moreover, E & Y will enjoy the benefit of a corresponding judgement reduction for the elimination of its contribution claims against any released party, including the PNC defendants, based on any securities law liability plaintiffs establish against E & Y. That reduction will be based on the greater of the released party's proportional share of liability or the amount it contributed toward plaintiffs' total damages. E & Y thus cannot be called upon to pay more than its fair share of any securities law liability established by plaintiffs.

E & Y also will enjoy sufficient reciprocity on the claims PNC assigned to the lead plaintiffs. PNC assigned its non-securities law claims against E & Y to plaintiffs and the putative class on December 17, 2004, pursuant to the MUO. Plaintiffs are not a released party under the settlement agreement and on the assigned claims they stand in the shoes of PNC as of December 17, 2004. By all accounts they can only advance their assigned claims as they then existed against E & Y. And E & Y will be free to advance any cross claim against PNC it could have raised in defense or set-off as of December 17, 2004, because the bar orders cannot be understood to extinguish previously existing claims that were expressly carved out from the operation of the settlement agreement and their concomitant defenses and set-offs. The applicable standards require as much. See In re Munford, Inc., 97 F.3d 449, 455 (11th Cir. 1996) ("When determining whether to enter a bar order against a non-settling defendant, the court must

make a reasoned determination that the bar order is fair and equitable."); In re Granada
Partnership Sec. Litig., 803 F. Supp. 1236, 1236 (S.D. Tex. 1992) (the touchstone for
determining whether a bar order should be approved is whether it is "fundamentally fair and
equitable to the non-settling defendants."). Thus, with regard to PNC's non-securities law claims
against E & Y, the partial settlement leaves the parties able to pursue the claims - plaintiffs and
E & Y - on equal footing: the legal positions PNC and E & Y held against each other as of
December 17, 2004. The doctrine of reciprocity requires nothing more.

E & Y also will enjoy sufficient protection for any claims it legitimately could have
pursued to judgement against the remaining released parties. Each of the released parties
contributed to the settlement in a manner that was essential to the partial settlement agreement
and is properly designated as a released party. See In re Consolidated Pinnacle W. Sec. Litig., 51
F.3d 194, 197 (9th Cir. 1995) (nonparty that was a critical participant and contributor to
settlement properly can receive the protection of a partial settlement's bar orders); In re Rite Aid,
146 F. Supp.2d at 731-32 (settling defendants' insurers properly protected by bar orders because
their contributions are reflected in any judgement reduction received by the non-settling
defendant). And as to those parties that had potential exposure emanating from their
participation in the underlying transactions giving rise to the securities litigation, E & Y will be
adequately protected through the settlement's judgement reduction provisions. By receiving a
reduction for the greater of the released party's percentage of responsibility or the amount paid by
or on behalf of the released party to the plaintiff class, E & Y has received maximum
compensation for its potential contribution claims against such entities, whether those claims are
based on state or federal law.

Second, any future effort to expand the Complete Bar Order beyond its proper scope will
be sufficiently curtailed by its inherent limitations.  Its sphere of operation is distinct from those
claims within the scope of the Reform Act Bar Order and the Pennsylvania Bar Order. By its
express terms the Complete Bar Order is limited  to claims "arising out of or relating to the acts

46

and transactions that are the subject of the Securities Litigation." Thus, to the extent E & Y truly has a claim against any released party that (1) is not dependent upon its potential liability to the putative class members and (2) arises in an independent setting, it will retain the right to pursue that claim.

Furthermore, the Complete Bar Order releases and discharges the released parties only "to the fullest extent allowed by law." In the event E & Y subsequently is concretely able to demonstrate that the Complete Bar Order illegally stripes it of an otherwise viable claim, it will retain the ability to pursue that claim as a matter of law. The savings clause thus precludes any improper and illegal use of the partial settlement agreement to E & Y's disadvantage. Such a limitation is implicit any contractual agreement. See Slatopolsky v. Balmoral Condominium Assoc., 427 So.2d 781, 781-82 (Ct. App. Fla. 1983) (use of the phrase "unless permitted by law" reflected an intent to incorporate the governing law and was consistent with the settled proposition that "implied in every contract is the fact that it is to be interpreted and enforced in accordance with the law."); California First Bank v. Braden, 264 Cal. Rptr. 820, 821 (Cal. Ct. App. 1989) (an expressed waiver of the statute of limitations "to the extent permitted by law" reflected the parties' understanding that their agreement necessarily incorporated the principles of law governing their undertaking to the extent they were relevant to any future dispute). It also flows from the court's approval of the settlement agreement and its explicit expression in the instant context provides an additional level of protection in assuring E & Y is called upon only to shoulder the level of securities law liability properly flowing to class members from its own misconduct.[5]

---

[5] For example, in the event an individual or entity claiming released party status were to commence an action against E & Y and assert a claim seeking to recover for an injury arising out of or related to the acts and transactions giving rise to the securities litigation that is not precluded by the Reform Act Bar Order, then E & Y will be able to assert that the savings clause and the doctrine of mutuality operate either to prohibit (1) the action or (2) any reliance on the Complete Bar Order in defense of the claims E & Y would have been able to raise against that individual/entity in this action had the released party been joined and the case proceeded to trial. There is ample support for such a position. See In re Rite Aid, 146 F. Supp.2d at 730

In follows that the expressed limitations of the Complete Bar Order will permit any court confronted with an actual controversy concerning its proper application to determine whether a particular claim advanced by E & Y properly is precluded. At this juncture the law requires nothing more. Rite Aid, 146 F. Supp.2d at 731.

Finally, E & Y will receive adequate credit for any claims it has against a released party that are not within the scope of the bar orders and the corresponding reduction in judgement provision governing the claims they extinguish. As to any such claim the partial settlement agreement obligates plaintiffs to credit against any judgement they obtain against E & Y "an amount equal to the amount of any final, non-appealable judgement which any Non-Settling Defendant may obtain against any of the Released Parties arising out of or relating to the Settled Claims of Lead Plaintiffs, the Class or any Class Member." Settlement Agreement at ¶ 16. Thus, assuming that E & Y actually possesses one or more truly independent claims against a released party "related to the Settled Claims" and/or is able to demonstrate that such a party is not lawfully entitled to the protection of the bar orders under the particular circumstances, E & Y is assured of receiving adequate compensation for such a claim in conjunction with its liability to

---

(recognizing the need for mutual reciprocity between the parties before the court); Wisconsin Investment Board, 300 F. Supp.2d at 1220 (recognizing that reciprocal bar order adequately compensates for any extinguished interrelated cross claim). And in the event the governing law requires vindication of such a position under the circumstances, E & Y would be entitled to its benefit. But the resolution of such issues can only occur through the presentation of something more than the hypothetical scenarios underlying E & Y's arguments concerning the potential shortcomings from the perceived lack of reciprocal mutuality in the proposed Complete Bar Order. In other words, just as a comprehensive analysis of E & Y's so-called "independent" claims cannot be undertaken at this juncture, the disposition and resolution of such claims and issues cannot occur until they are presented to a tribunal for actual resolution. In contrast, it is clear at this juncture that under the circumstances E & Y is barred from seeking to shift any ultimate securities law liability it may owe to the putative class to a released party. Compare Eichenholtz, 52 F.3d at 483-87. Thus, while the proposed settlement bars any interrelated cross claims against the released parties, the saving clause will preclude future efforts by such parties to use the protections of the settlement and its Complete Bar Order under inequitable circumstances or where fairness otherwise so requires. Consequently, while the limits on our jurisdiction preclude us from venturing beyond these generalized assessments, it is clear that E & Y's hypothetical concerns do not provide a valid basis for rejecting the partial settlement.

plaintiffs. This added protection sufficiently undermines E & Y's speculative concerns about its ability to receive compensation for some hypothetical claim(s) that may arise in some future litigation or its inability to rectify any injury arising from individuals improperly attempting to avail themselves of released party status.

In short, the pertinent provisions of the partial settlement agreement operate within the scope of discretionary measures permitted under the controlling and persuasive precedent and contain adequate limitations to assure the agreement will not be used in the future to transcend its legitimate sphere of operation. Because E & Y inevitably will be treated fairly as to any securities liability arising from its conduct, the claims assigned pursuant to the MOU, and any truly independent claims it may have against the released parties, its objections are unavailing and must be overruled. Accordingly, Lead Plaintiffs' motion for final approval of partial class action settlement will be granted.[6]

Date: July 13, 2006

David Stewart Cercone
United States District Judge

cc:

Barry A. Weprin, Esquire
Bruce D. Bernstein, Esquire
Milberg Weiss Bershad & Schulman, LLP
One Pennsylvania Plaza
New York, NY 10119

_____

[6] The court also will grant Lead Plaintiffs' motion for approval of attorneys' fees and costs. No objections have been made to the request. In addition, the court has reviewed the request under the guiding principles of the percentage-of-recovery and lodestar approaches, see In re Rite Aid Corp. Sec. Litig., 396 F.3d 294 (3d Cir. 2005), and finds the requested amount reasonable in light of the size of the fund, the complexity of the litigation and the skill and experience of counsel.

Alfred G. Yates, Jr., Esquire
Gerald L Rutledge, Esquire
Law Offices of Albert G. Yates, Jr.
429 Forbes Ave.
519 Allegheny Building
Pittsburgh, PA 15219

W. Thomas McGough, Jr., Esquire
Traci Sands Rea, Esquire
Reed Smith LLP
435 Sixth Ave.
Pittsburgh, PA 15219

Alan J. Davis, Jr., Esquire
Raymond A. Quaglia, Esquire
Ballard, Spahr, Andrews & Ingersoll
1735 Market St., 51st Floor
Philadelphia, PA 19103

Richard R. Nelson, II, Esquire
Patrick G. Barry, Esquire
Cohen & Grigsby
11 Stanwix St., 15th Floor
Pittsburgh, PA 15222

Edward M. Posner, Esquire
Michael F. Brown, Esquire
William M. Connolly, Esquire
Robert Particelle, Esquire
Drinker, Biddle & Reath
One Logan Square
18th & Cherry Sts.
Philadelphia, PA 19103

Michael Flanagan, Esquire
John Sture, Esquire
Paul Blankenstein, Esquire
Gibson, Dunn & Crutcher
1050 Connecticut Ave., N.W.
Washington, DC 20036

Avrum Levicoff, Esquire
Alan T. Silko, Esquire
Levicoff, Silko & Deemer, P.C.
Centre City Tower, Suite 1900
650 Smithfield Street
Pittsburgh, PA 15222-3911

Daniel J. Standish, Esquire
William E. Smith, Esquire
Valerie E. Green, Esquire
Wiley Rein & Fielding LLP
1776 K Street, NW
Washington, DC 20006

David L. McClenahan, Esquire
Thomas M. Reiter, Esquire
Roberta D. Anderson, Esquire
Kirkpatrick & Lockhart, LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222

Luke D. Lynch, Jr. Esquire
Barbara R. Seymour, Esquire
Maria T. Ehrlich, Esquire
D'Amato & Lynch
70 Pine Street
New York, NY 10270-0110

Jay P. Saltzman, Esquire
Schoengold Sporn Laitman
    & Lometti, P.C.
19 Fulton Street
Suite 406
New York, NY 10038

Louis W. Fryman, Esquire
200 Market St., 10th Floor
Philadelphia, PA 19103

51